592 F.2d 681
 Lou J. D'IORIO, Appellee,
v.
COUNTY OF DELAWARE and Faith Ryan Whittlesey, Charles C.
Keeler and William A. Spingler, Members of the
County Council of the County of
Delaware, Appellants in 78-1517
and
Frank T. Hazel, District Attorney for the County of
Delaware, Appellant in 78-1516.
 Nos. 78-1516, 78-1517.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 19, 1978.
Decided Dec. 20, 1978.
 
 Robert A. Graci, Drexel Hill, Pa., counsel for appellant in No. 78-1516.
 Francis P. Connors, Delaware County, Media, Pa., counsel for appellants in No. 78-1517.
 Jack Brian, Richard, Brian, DiSanti & Hamilton, Media, Pa., for appellee Lou J. D'Iorio.
 Francis P. Connors, County Sol., Harry J. Bradley, Asst. County Sol., William J. Reese, Asst. County Sol., County of Delaware, Media, Pa., for appellants Whittlesey, Keeler and Spingler.
 Robert A. Graci, Asst. Dist. Atty., D. Michael Emuryan, Deputy Dist. Atty., Media, Pa., for appellant Hazel.
 Before ROSENN, GARTH and BIGGS, Circuit Judges.
 OPINION OF COURT
 GARTH, Circuit Judge:
 
 
 1
 In this civil rights action brought under 42 U.S.C. § 1983, the District Attorney and the members of the County Council of the County of Delaware, Pennsylvania appeal from a decision of the district court which ordered that Lou J. D'Iorio, a former County Detective, be reinstated with back pay. On appeal, their primary contention is that the district court should have abstained, under the doctrine of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), from deciding the constitutional claims raised by D'Iorio. Because we have determined that the state law underlying these constitutional issues is uncertain, and that this law is amenable to a construction by the Pennsylvania courts that would obviate the need for a constitutional adjudication, we conclude that the district court should have abstained in this case and should not have addressed the merits of any constitutional issues. Accordingly, we reverse.
 
 I.
 
 2
 D'Iorio, the plaintiff below, was hired as a detective in the Criminal Investigation Division of the Delaware County District Attorney's office in March, 1970. After the completion of a three month probationary period, he was informed by Rocco Urella, then head of the Criminal Investigation Division, that he was a permanent employee of the County. At no time, however, did D'Iorio have a written contract of employment with either the County or his direct supervisor, the District Attorney.
 
 
 3
 On February 26, 1976 D'Iorio was summoned to the office of District Attorney Frank Hazel and confronted with a photograph that depicted D'Iorio in a state of near-complete undress in the presence of his wife and another woman. D'Iorio was informed that during the course of a drug raid conducted by Chester County, state and federal law enforcement agents, the photograph had been found in the possession of two individuals, both of whom were known to have extensive criminal records. Also present at the meeting called by Hazel were Division Chief Urella, who had originally hired D'Iorio, John Crane, Chief Deputy District Attorney for Trials, and John Reilly, Chief Deputy District Attorney for Special Services.
 
 
 4
 The District Attorney had arranged this meeting to discuss with D'Iorio the photograph and its possession by two known criminals. Apparently D'Iorio was unable to offer an explanation which was satisfactory to the District Attorney, for D'Iorio was discharged from his position the next day, on February 27, 1976. Prior to his termination, D'Iorio had requested, and was denied, a more extensive hearing pertaining to these matters. The reason given for his termination was that the discovery of the photograph had placed the District Attorney's office in a compromising position which undermined its ability to keep the confidence and obtain the cooperation of other law enforcement agencies.
 
 
 5
 The fact of D'Iorio's dismissal was widely circulated in the community, including publication in the Philadelphia Inquirer and Philadelphia Magazine. There appears to be a disputed issue of fact as to whether this public disclosure was caused by D'Iorio or by officials of the County of Delaware. Since his termination, D'Iorio has had substantial difficulty in securing new employment and has worked only sporadically.
 
 
 6
 This lawsuit was commenced when D'Iorio, on April 7, 1977, filed a § 1983 action in federal district court alleging that his discharge violated his fourteenth amendment rights.[1] Specifically, D'Iorio contends that he was denied due process because the procedures employed in discharging him were arbitrary, capricious, and in violation of the County's Home Rule Charter. He also asserts that he has been deprived of property and liberty interests without an adequate hearing.
 
 
 7
 The defendants named in the lawsuit were the County of Delaware, the County District Attorney, and the Members of the County Council. These defendants argued, and upon service of D'Iorio's complaint moved, that the district court abstain from deciding D'Iorio's constitutional claims until the County Home Rule Charter has been construed by the Pennsylvania state courts. The Charter, they contend, is amenable to a construction that would render an adjudication of the constitutional issues unnecessary. In addition, these defendants raise a number of defenses addressed to the merits of D'Iorio's § 1983 action.
 
 
 8
 The district court concluded that the legal rights created by the Home Rule Charter were clear on the face of the Charter, and declined to abstain solely on that ground. D'Iorio's discharge was found to be in violation of the procedures established by the Charter for termination of county employees. Without reaching D'Iorio's claims concerning the deprivation of his property and liberty interests, the district court decided that this perceived procedural irregularity contravened the due process guarantee against arbitrary governmental action.[2] Based on this constitutional violation, the district court ordered D'Iorio's reinstatement and imposed liability for back pay on the County Detective and the Members of the County Council in their official capacities.[3] Supplemental briefing was ordered on the issues of expungement of the dismissal from plaintiff's record and the award of attorneys fees, but this appeal was taken before the lower court was afforded an opportunity to adjudicate these matters.[4]
 
 II.
 
 9
 In Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court fashioned the abstention doctrine which involves a discretionary exercise of a court's equity powers in declining to adjudicate claims within the scope of its statutory jurisdiction in order to avoid " 'needless friction' between federal pronouncements and state policies." Reetz v. Bozanich, 397 U.S. 82, 87, 90 S.Ct. 788, 790, 25 L.Ed.2d 68, 72 (1970). At its core, this doctrine requires a federal court to refrain from deciding federal constitutional issues until related state law issues have first been adjudicated in state court.[5] The special circumstances generally prerequisite to the application of this doctrine are threefold. First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies. In addressing an abstention claim, a district court must first consider whether the particular case falls within the ambit of Pullman as defined by these criteria, and must then make a discretionary determination, based on the weight of these criteria and other relevant factors, as to whether abstention is in fact appropriate.
 
 
 10
 The task of this court in reviewing a district court's abstention decision is essentially twofold, and in large part tracks the district court analysis. We must first ascertain whether the facts and legal issues presented bring the case within the "special circumstances" generally required for application of the abstention doctrine. This includes deciding whether state law is uncertain, and whether state law is amenable to a construction that would obviate or narrow the constitutional issues presented. These decisions are essentially legal in nature, and may be undertaken De novo by an appellate court.[6] While an appellate court may also decide the additional factor of whether an erroneous federal court determination of state law would have a disruptive effect on state policies, this appraisal is more discretionary in character, and greater deference will generally be accorded to a district court's appraisal if it is adequately explained. Once it is ascertained that the case is within the general ambit of Pullman, "the remaining question is whether the trial judge abused his discretion in weighing the advantages and disadvantages of abstention and deciding to invoke the Pullman doctrine." Frederick L. v. Thomas, 578 F.2d 513, 517 (3d Cir. 1978).
 
 III.
 
 11
 Having set forth the basic components of the abstention doctrine and this Court's role in reviewing a district court's decision to abstain or not, we turn to a consideration of those factors constituting the "special circumstances" required for the application of the abstention doctrine as they bear on the facts of this case.
 
 
 12
 A. Uncertainty of State Law.
 
 
 13
 D'Iorio's claim that he could be terminated from his employment only by action of the County Council is founded upon Section 1211(b) of the Delaware County Home Rule Charter, which provides as follows:
 
 
 14
 All employees of the county on December 31, 1975, except those holding offices abolished by this charter, shall continue in employment, at rates of compensation during the year 1976 not lower than their salary levels existing on December 31, 1975, until succeeded or removed by action of council.[7]
 
 
 15
 Agreeing with D'Iorio's argument, the district court determined that abstention was not appropriate since "there is no Unclear question of state law involved because the requirement that there must be Council action in order to discharge plaintiff is clear on the face of the Charter." D'Iorio v. County of Delaware, 447 F.Supp. 229 (E.D.Pa.1978).[8]
 
 
 16
 While the district court's characterization of section 1211(b) as "clear on (its) face" cannot be gainsaid when reference is made only to that particular section of the Charter, the ostensible clarity of this provision becomes much less obvious when account is taken of other provisions of the Charter and of state law. In particular, Section 503 of the Charter, which vests the County District Attorney with power to oversee and supervise the employment of county detectives, was not considered by the district court. This section reads in relevant part as follows:
 
 
 17
 b. The District Attorney shall appoint and supervise the Criminal Investigation Division whose function it shall be to provide to the District Attorney, local government police departments as requested, and such other law enforcement agencies or authorities as approved by the District Attorney, professional criminal investigative services in support of the county criminal justice system.
 
 
 18
 c. The District Attorney may appoint and supervise county detectives who shall have all powers presently conferred by Commonwealth law, who shall be general police officers and shall have all powers conferred on constables by existing laws of the Commonwealth so far as they relate to crime or criminal procedures.
 
 
 19
 Substantial arguments have been advanced by the District Attorney and County Council members that Section 503 is a specific exception to Section 1211(b). It is contended that the District Attorney's power to appoint and supervise in a case such as this one includes the power to discharge. First, the plain meaning of the term "supervise" may be understood as including within its contemplation the power to discharge.[9] Second, the plausibility of this construction is supported by the fact that other provisions of the Charter providing for appointment by department heads do not include the power to appoint And supervise.[10] Finally, the County District Attorney is an elected, not an appointed, official of the county. Accordingly, in the exercise of the power to discharge department employees he would be held politically accountable to the general county electorate.
 
 
 20
 In addition to considering the effect of section 503(b) of the Home Rule Charter as it impacts upon section 1211(b), it appears that certain provisions of state law must be considered as well. The legislation providing for the adoption of home rule charters, the Home Rule Charter and Option Plans Law, Penn.Stat., Title 53, §§ 1-101 et seq. (Purdon 1974), provides in relevant part that:
 
 
 21
 "All acts and parts of acts, local, special, or general, affecting the organization, government and powers of (a municipality adopting a home rule charter) which are not inconsistent or in conflict herein, shall remain in full force until modified or repealed as provided by law." Id. at § 1-401.
 
 
 22
 In keeping with this provision, Section 501 of the Home Rule Charter states:
 
 
 23
 "The District Attorney shall be elected to a four year term. Except as otherwise provided in this charter, the District Attorney shall have all the powers and duties granted by Commonwealth law, by laws applicable to counties of the Second Class A for District Attorneys, by this charter or by ordinance of Council."
 
 
 24
 The Second Class County Code, Penn.Stat., Title 16, §§ 3101 et seq. (Purdon 1956 & Supp.1978), which established the form of government in Delaware County prior to adoption of the Home Rule Charter, states:
 
 
 25
 "The district attorney may appoint one chief county detective, an assistant chief county detective, and as many county detectives, sergeant, special county detectives and junior county detectives as the salary board shall fix." Id. at 4440(a).
 
 
 26
 These employees could be terminated in accordance with the provisions of § 3450 of the Second Class County Code:
 
 
 27
 "Appointees to county offices or positions other than to elected offices shall be subject to removal at the pleasure of the appointing power, except as otherwise expressly provided by law, and they shall also be removed on conviction of misbehavior in office or of any infamous crime."
 
 
 28
 No express determination was made by the district court on the doubtful issue as to whether the Home Rule Charter has entirely superseded these provisions of the Second Class County Code, or whether, in accordance with section 501 of the Home Rule Charter, these provisions of the Second Class County Code continue to authorize the district attorney to discharge county detectives. Nor did the district court attempt to reconcile section 1211(b) with either section 503 or the Second Class County Code provisions.
 
 
 29
 Pennsylvania case law may also be relevant in defining D'Iorio's legal rights with respect to his tenure as a county detective.[11] In Hartshorn v. Allegheny County, 9 Pa.Cmwlth. 132, 304 A.2d 716 (1973), the Commonwealth Court held that Allegheny County detectives were "policemen" within the meaning of a state statute, Penn.Stat., Title 43, § 217.1 (Purdon Supp.1978), conferring on policemen and firemen the right to bargain collectively with their public employers. Kretzler v. Ohio Township, 14 Pa.Cmwlth. 236, 322 A.2d 157 (1974), in turn, interpreted the Local Agency Law, Penn.Stat., Title 53, § 11302 (Purdon 1972), as requiring that township police officers be afforded an administrative hearing prior to a reduction in rank, and that both the appointing authority and the officers be granted an opportunity for judicial review. But cf. Amesbury v. Luzerne County Institution District, 27 Pa.Cmwlth. 418, 366 A.2d 631 (1976) (at will employee of county institution district has no due process right under Local Agency Law). Again, the district court did not consider whether these cases are relevant to D'Iorio's discharge despite enactment of the Home Rule Charter.
 
 
 30
 It may well be that ultimately the district court will be vindicated in its conclusion, in that the Council may be adjudged to be the appropriate "discharging" authority. However, in the context of abstention analysis, our task is, as we have stated, limited to determining whether the state law which controls this issue is uncertain. Once we conclude that such is the case, we are not free to resolve that uncertainty ourselves. Rather, we must leave that merit determination to the state courts provided the other abstention criteria, discussed Infra, are consistent with that resolution. From our discussion thus far, it is apparent that the state law underlying D'Iorio's constitutional claims is highly uncertain, particularly since the Delaware County Home Rule Charter has only recently been enacted and has not been authoritatively construed by the courts of Pennsylvania. We are convinced, therefore, that state law, far from being clear, is so sufficiently unsettled that the first criterion prerequisite to abstention has been satisfied.
 
 
 31
 B. Effect of State Law on D'Iorio's Constitutional Claims.
 
 
 32
 It is possible for the state courts to interpret the Home Rule Charter, state statutes, and judicial precedents in such a way as to narrow substantially the constitutional claims raised by D'Iorio.[12] If either section 501 of the Home Rule Charter or section 3450 of the Second Class County Code is construed as authorizing D'Iorio's discharge by the County District Attorney, D'Iorio could no longer assert a due process claim that he was terminated in violation of procedures established by the Home Rule Charter.[13] Furthermore, a construction of the Home Rule Charter or the Second Class County Code may clarify the extent to which D'Iorio may have a property interest in his employment. These provisions may be interpreted by the courts of Pennsylvania as authorizing D'Iorio's employment on no more than an "at will" basis, thereby negating any protected property interest in his job. Such a construction would obviate the need for a constitutional property interest adjudication concerning the circumstances, if any, under which D'Iorio might be entitled to a due process hearing. Alternatively, if it were determined that the Kretzler and Hartshorn decisions did provide D'Iorio with a property interest cognizable for due process purposes, application of the procedures mandated by these decisions might render unnecessary a federal court's specification of the procedures to be employed. Finally, if issues pertaining to D'Iorio's liberty interest claim are presented by him for final adjudication in the state courts, return to the federal courts may be rendered unnecessary.
 
 
 33
 In addition to avoiding these constitutional issues, abstention in this case may render unnecessary difficult issues of statutory interpretation concerning (1) the scope of § 1983 immunities,[14] (2) the type of official conduct necessary to give rise to § 1983 liability,[15] and (3) the type of injury which must be proved to recover damages under § 1983.[16]C. The Effect of an Erroneous Federal Court Decision Concerning State Law.
 
 
 34
 Any decision by the district court in this case would of necessity affect the sensitive area of state control of state law enforcement officials. If the district court erred in concluding that the District Attorney lacked the authority to discharge county detectives, this would impose a significant cloud on the District Attorney's continuing ability to issue orders effectively and to maintain the necessary quality of staff and discipline within the criminal investigation division. Also, reinstatement of D'Iorio might have the effect, as claimed by the District Attorney, of undermining the ability of county law enforcement officials to maintain the cooperation and confidence of other local, state, and federal law enforcement agencies. Moreover, the district court's implicit determination that the applicability of various provisions of the Second Class County Code to Delaware County did not survive enactment of the Home Rule Charter might, if erroneous, prove disruptive of future attempts by county officials or county employees to rely on rights created by the general laws of Pennsylvania. These possible effects of an erroneous federal court interpretation of state law constitute the type of disruption of state policies that the abstention doctrine was designed to prevent.[17]
 
 IV.
 
 35
 Having determined that the "special circumstances" prerequisite to application of the abstention doctrine are present in this case, we must next determine whether abstention is appropriate. We are guided at this juncture by Supreme Court decisions which indicate that, absent significant reasons to the contrary,[18] abstention is generally proper once it ascertained that the threshold "special circumstances" have been fulfilled. See Bellotti v. Baird, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); Harris County Commissioners Court v. Moore, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); Lake Carriers' Association v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972).[19]
 
 
 36
 Most relevant to the present case is the Supreme Court's decision in Boehning v. Indiana State Employees Association, 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975) (per curiam). There, a dismissed state employee brought a § 1983 action alleging that her due process right to a pre-termination hearing had been violated. The Supreme Court ruled that the district court, whose decision had been reversed by the court of appeals, had properly abstained from ruling on the due process claim because state law was amenable to two constructions, one that required a pre-termination hearing and one that did not. As a result, the state courts would be able to interpret state law so as to avoid any constitutional issue. However, any federal court interpretation of state law in that circumstance, the Supreme Court noted, would be only a "forecast." Similarly, in the instant case Pennsylvania law is amenable to a construction that would sharply limit the scope of the constitutional issues presented. Here, as in Boehning, any federal court interpretation of state law would be no more than a "forecast."
 
 
 37
 Again, in Harris County Commissioners Court v. Moore, 420 U.S. 77, 84, 95 S.Ct. 870, 876, 43 L.Ed.2d 32 n.8 (1975), the Supreme Court stated that "where the challenged statute is part of an integrated scheme of related constitutional provisions, statutes, and regulations, and where the scheme as a whole calls for clarifying interpretation by the state courts, we have regularly required the district courts to abstain." As in Harris, so too here, the relevant provisions of state law must be read in the context of the Delaware County Home Rule Charter and the state statutes governing counties and county officials. This integrated and complex scheme of state and local law requires clarifying interpretation by the state courts.
 
 
 38
 We are forced to conclude that federal court abstention is required until the relevant state law issues have been decided by the Pennsylvania courts. All three of the criteria prerequisite to abstention have been fulfilled. D'Iorio's constitutional claims may be significantly narrowed by a state court interpretation of uncertain state law, the erroneous interpretation of which by the federal courts may have a significant disruptive effect on important state policies. We consider these factors to far outweigh any factors that might militate against abstention in this case. Finally, our decision is strongly influenced by the Supreme Court's decision in Boehning, which involves a factual pattern not unlike the one presented in this case.
 
 
 39
 For all of these reasons, we will remand with directions that the district court's order of February 23, 1978 be vacated, and that the district court retain jurisdiction and stay further proceedings pending a determination of proceedings in the appropriate state courts. See Zwickler v. Koota, 389 U.S. 241, 244, 88 S.Ct. 391, 19 L.Ed.2d 444 n.4 (1967). Cf. Harris County Commissioners Court v. Moore, 420 U.S. 77, 88, 95 S.Ct. 870, 43 L.Ed.2d 32 n.14 (1975). The parties are each to bear their respective costs.
 
 
 
 [1]
 An action had earlier been commenced in state court, but was discontinued at about the time that the federal court action was initiated
 
 
 [2]
 The district court relied on a well established line of cases which hold that an administrative agency's failure to comply with its own prescribed procedures may make its action so arbitrary as to amount to a due process violation, at least when those procedures are designed for the protection of the individual whose interests are being affected. See Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States v. Leahey, 434 F.2d 7 (1st Cir. 1970); United States v. Heffner, 420 F.2d 809 (4th Cir. 1969)
 
 
 [3]
 Although D'Iorio originally moved for preliminary injunctive relief on April 14, 1977, the April 22, 1977 hearing held on this matter was treated by the district court and the parties as a final hearing. N.T. at 13. Following this hearing, briefs addressed to the merits of the case were submitted by the parties. In the Adjudication and Order filed on February 23, 1978, (the order from which this appeal has been taken) the district court granted permanent injunctive relief in favor of D'Iorio
 Because the district court's decision was handed down prior to the Supreme Court's decision in Department of Social Services v. Monell, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the County was dismissed as a party on the authority of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). D'Iorio did not cross-appeal from dismissal of the County as a party. In the event, however, that at some future time the district court confronts this issue, effect should be given to the Supreme Court's Monell decision. McKnight v. SEPTA, 583 F.2d 1229, No. 77-2563 (3d Cir. filed September 29, 1978).
 
 
 [4]
 As a result of the order requiring supplemental briefing, this appeal is not from a final order of the district court whereby this court would have appellate jurisdiction under 28 U.S.C. § 1291. Nonetheless, because the district court granted D'Iorio's requested injunctive relief and ordered his reinstatement as a county detective, this appeal is properly before us under 28 U.S.C. § 1292(a)(1) (authorizing appeals from injunctive orders). When appellate jurisdiction is established on this basis, the entire order, and not simply the propriety of the injunctive relief, is before the court for review. Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir. 1972), Cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); McNally v. Pulitzer Pub. Co., 532 F.2d 69 (8th Cir.), Cert. denied, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1978)
 
 
 [5]
 This statement describes the paradigmatic case in which abstention is justified, for this type of abstention enables the state courts to function as the ultimate arbiters of state law and the federal courts to adjudicate issues of federal law. See Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U.Pa.L.Rev. 1071, 1080-90 (1974). Although the state courts are competent to adjudicate federal claims, and must in fact be presented with a party's federal claims if those claims may influence the construction of state law, Government Employees v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), there are two methods by which the federal courts will retain the final word on issues of federal law in cases in which they have initially abstained. First, the parties remitted to state court under the abstention doctrine may reserve the right to have their federal claims adjudicated in federal court following the state court adjudication of state law issues. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Second, even if the reservation provided for by England is not asserted, there remains the possibility of Supreme Court review of the federal issues finally decided by the state courts
 The Supreme Court has also held abstention to be appropriate in certain diversity actions in which no federal issues are raised, Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Kaiser Steel Corp. v. W. S. Ranch Co., 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968); and in cases in which the state and federal issues were so intertwined that the effect of abstention was to remit completely the federal issues to the state court. See Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Alabama Pub. Serv. Comm'n v. Southern Ry., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). Because the present case is not of this sort, we need not consider the propriety of abstention in such circumstances. See Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative, 583 F.2d 104 (3d Cir. filed August 25, 1978). See generally, P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 988-1009 (2d ed. 1973).
 
 
 [6]
 In Lipp v. Morris, 579 F.2d 834 (3d Cir. 1978) (per curiam), this Court was required to review a district court's refusal to abstain. After independently concluding that state law was not uncertain, we affirmed the district court's decision. Our independent review of the clarity of state law was evidenced by our holding:
 "Here we hold that the statute is not of an uncertain nature and, therefore, the case does not qualify for application of the abstention doctrine."
 Id. at 836. See Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (abstention not proper where state statute clear and unambiguous); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (affirming refusal to abstain when state law unambiguous).
 
 
 [7]
 The Home Rule Charter also directed the County Council to promulgate an Administrative Code by December 31, 1976, which was to designate procedures for merit employment and promotion. Delaware County Home Rule Charter § 1002. This Code was also to establish an employee grievance appeal procedure, and would presumably specify procedures for the termination of county employees. Certain county positions were exempted from coverage by the merit procedures, but the position of county detective was not among those exempted. Id. at § 1014. The Administrative Code was finally adopted on July 5, 1978, to become effective on July 15, 1978, and is not part of the record on this appeal. Whether the provisions of the Home Rule Charter vesting the County Council with interim power to discharge county employees and authorizing promulgation of the Administrative Code could be construed as conferring on D'Iorio a property right in his employment was not considered by the district court. This issue, as well as the possible retroactive effect of the Administrative Code, present additional uncertain issues of state law which militate in favor of abstention
 
 
 [8]
 The district court declined to abstain wholly on this ground, concluding that the case did not fall within the ambit of Pullman. No consideration was therefore given to the other criteria relevant to an abstention decision
 
 
 [9]
 The term "supervisor" is defined, at least, as "such a person having authority delegated by an employer to hire, transfer, suspend, recall, promote, assign, or Discharge another employee or to recommend such action. . . ." Webster's Third New International Dictionary 2296 (1966) (emphasis added)
 
 
 [10]
 Delaware County Home Rule Charter §§ 407, 422, 424(b), 503(a), 607, 802
 
 
 [11]
 D'Iorio, in attempting to establish a property interest in his employment, asserts that he had a mutual understanding with his employer that after a three month probationary period he would be a "permanent" employee of the County. See Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). This issue was not ruled upon by the district court. Whether or not this mutual understanding rose to the level of a property interest is a matter of state law, Bishop v. Wood, 426 U.S. 341, 344-45, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), and may be considered by a state court in proceedings pursuant to a federal court abstention decision
 
 
 [12]
 D'Iorio contends that abstention is not appropriate because his due process "liberty interest" claim does not involve questions of state law. However, abstention is appropriate not only when state court proceedings may obviate entirely the need for a constitutional decision, but also when they "might avoid in whole or In part the necessity for federal constitutional adjudication." Bellotti v. Baird, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) Quoting Harrison v. NAACP, 360 U.S. 167, 177, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959) (emphasis added). The district court in this case did not pass on D'Iorio's liberty interest claim, and it would be inappropriate for us to do so at this time. In the event further federal proceedings ensue D'Iorio may then renew his liberty interest claim. See generally McKnight v. SEPTA, 583 F.2d 1229, No. 77-2563 (3d Cir. filed September 29, 1978)
 
 
 [13]
 In most cases raising abstention issues, challenge is made to the constitutionality of a state statute or to the constitutionality of official action arguably beyond the scope of state statutory authority. See Developments in the Law Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1255 (1977). A decision to abstain will enable a state court to provide a narrowing construction for the challenged statute or to hold that the challenged official action is not authorized by statute, thereby avoiding a constitutional decision in either instance. In this case, D'Iorio's challenge is directed in the first instance at the authority of the County District Attorney to terminate his employment. Sustaining the District Attorney's authority to discharge D'Iorio will not necessarily raise issues of a constitutional dimension. These issues will be raised only if it is then determined that D'Iorio had a property interest or liberty interest infringed by his summary discharge. Because adjudication of these constitutional issues may be avoided we think that abstention is singularly appropriate in this case
 
 
 [14]
 Since the district court's back pay award was imposed against the District Attorney and members of the County Council in their official capacities, the immunities from individual § 1983 damage liability are not relevant in this case. See Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)
 Prior to the Supreme Court's decision in Monell, some courts had held that local government officials enjoy an immunity from damage liability in their official capacities when the effect of imposition of liability would be to circumvent the holding of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See, e. g., Monell v. Department of Social Services, 532 F.2d 259 (2d Cir. 1976), Reversed, 46 U.S.L.W. 4569 (U.S. June 6, 1978). This logic had also been extended by some courts to bar actions seeking equitable monetary relief, at least when the payments were retroactive in nature. See, e. g., Monell v. Department of Social Services, 532 F.2d 259 (2d Cir. 1976), Reversed, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Muzguiz v. City of San Antonio, 528 F.2d 499 (5th Cir. 1976) (en banc). Other courts, however, distinguished equitable monetary relief from money damages, and held that the former relief was available against government officials in their official capacities despite Monroe v. Pape, supra. See, e. g., Burt v. Bd. of Trustees of Edgefield City School Bd., 521 F.2d 1201 (4th Cir. 1975); Thomas v. Ward, 529 F.2d 916 (4th Cir. 1975); Incarcerated Men of Allen County Jail v. Fair, 507 F.2d 281 (6th Cir. 1974) (equitable award of attorneys fees); Harkless v. Sweeny Ind. School Dist., 427 F.2d 319 (5th Cir. 1970), Cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).
 After Monell, it would appear that local government officials are suable in their official capacity for money damages or monetary equitable relief except when the imposition of such liability would amount to the imposition of Respondeat superior liability on a local government unit not itself suable under the standards set forth in Monell. If the distinction drawn by some courts between money damages and equitable monetary relief is proper, it may be that an award of the latter type could not give rise to Respondeat superior liability.
 
 
 [15]
 Under the Supreme Court's decisions in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and Department of Social Services v. Monell, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the "mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." Dep't of Social Services v. Monell, 436 U.S. at 694, 98 S.Ct. at 2037 n.58. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There is a serious question as to whether the conduct of the County Council in this case is sufficient to give rise to § 1983 liability
 
 
 [16]
 Recently, in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), a case involving the suspension of students in violation of their due process rights, the Supreme Court explained that § 1983 was intended to provide compensation for provable damages. Absent proof of actual injury, the denial of due process would be actionable only for nominal damages. In considering what might constitute actual injury, the court held that if the school officials could prove on remand that the students would have been suspended had a proper hearing been held, they would not be entitled to recover damages designed to compensate them for the injuries caused by suspension. 435 U.S. at 260, 98 S.Ct. 1042. The court in a footnote disapproved certain Court of Appeals cases which allowed the award of back pay to employees discharged in violation of their due process rights even though no reinstatement was ordered because additional proceedings would simply have resulted in their discharge. Id. at 260, 98 S.Ct. 1042 n.15. Thus, even if it were determined in this case that only the County Council was authorized to discharge D'Iorio, D'Iorio's claim to back pay would appear to be undermined seriously by proof that the County Council would have discharged him using proper procedures
 
 
 [17]
 The significant disruption of important state policies that might result from an erroneous decision of state law in part distinguishes this case from this court's recent decision in McKnight v. SEPTA, 583 F.2d 1229 No. 77-2563 (3d Cir. filed September 29, 1978). The plaintiff in McKnight commenced a § 1983 action alleging that his discharge without a hearing from his position as a special investigator in SEPTA's security force deprived him of liberty and property without due process. The district court, on the authority of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), dismissed the § 1983 damage action against SEPTA. It then held that the complaint failed to state a claim of infringement of a liberty interest directly under the fourteenth amendment, and that state law underlying the property interest claim was sufficiently uncertain that abstention was appropriate. This court vacated and remanded for consideration of the Supreme Court's intervening decision in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and reversed that part of the district court's decision holding that the plaintiff had failed to state a claim as to deprivation of a liberty interest. Although this court refused to hold that the district court's abstention decision on the property interest claim constituted an abuse of discretion, it suggested that this decision be reconsidered on remand, and strongly hinted that abstention was not appropriate. This court concluded that an erroneous decision of state law would not disrupt important state policies, and that it would be efficient to adjudicate the property interest claim along with the liberty interest claim
 Here in contrast, the effect on state policies is considerably more significant and far-reaching. An erroneous state law decision could substantially undercut the District Attorney's disciplinary authority and the ability of county officials to work with other law enforcement agencies. Moreover, in light of the context in which D'Iorio's liberty interest claim is asserted, it would appear to be less compelling than the claim giving rise to the McKnight litigation.
 
 
 [18]
 The principal reasons militating against abstention are the long delays that necessarily ensue in staying the adjudication of federal claims pending state court proceedings, See Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Frederick L. v. Thomas, 578 F.2d 513, 518 (3d Cir. 1978) (Gibbons, J., dissenting), the substitution of a state for a federal factfinder, See Conover v. Montemuro, 477 F.2d 1073 (3d Cir. 1973), Affirmed in part and vacated in part, 477 F.2d 1093 (3d Cir. 1973) (en banc), and the prognosis that the adjudication of state law issues will have little effect on the federal claims, Harris County Commissioners Court v. Moore, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). Although an abstention order may necessarily delay the adjudication of D'Iorio's federal claims and substitute a state for a federal factfinder on certain issues, that consideration may be outweighed when balanced against the important public policies implicit in the Pullman -type abstention doctrine
 
 
 [19]
 Of the cases in which the Supreme Court has held abstention to be improper, many involved first amendment challenges to state statutes alleged to be vague or overbroad on their face. See, e. g., Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). In such circumstances, little would be gained by abstention because the state statutes would often not be amenable to a construction which would avoid or narrow constitutional issues