**UNITED STATES of America, Appellee,**

v.

**Samuel D. WRIGHT, Appellant.**

**No. 176, Docket 78–1219.**

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1978.

Decided Dec. 4, 1978.

Certiorari Denied Feb. 21, 1979. See 99 S.Ct. 1236.

Gerald L. Shargel, New York City (Fischetti & Shargel, New York City, Gustave H. Newman and Roger Bennett Adler, New York City, of counsel), for appellant.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y., for the Eastern District of New York, for appellee.

Before SMITH, FEINBERG and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from conviction and sentence on trial to the jury in the United States District Court for the Eastern District of New York, Edward R. Neaher, *Judge,* of a school board official for solicitation and receipt "under color of official right" of a payment of $5,000 from a seller of school supplies, in violation of the Hobbs Act, 18 U.S.C. § 1951, and conspiracy to defraud the United States of federal funds granted to the school district, in violation of 18 U.S.C. § 371. We find no reversible error and affirm the judgment.

In 1973, while Wright was chairman of New York City Community School Board 23, Behavioral Research Laboratories, Inc. ("BRL"), a seller of educational systems and materials to schools, which had a contract with the board for the 1972–73 school year amounting to over $500,000, invited Wright to speak at a conference which it conducted. Wright received $5,500 for this appearance, $5,000 of which the government contended and the jury must have found was induced by Wright and paid by BRL to influence the decision of the board to purchase educational materials from BRL.

On appeal, Wright contends that the evidence was insufficient to show that the payment was solicited in order to influence his official action, that the government wrongfully refused to grant immunity to a witness, that the admission of an out-of-court statement deprived him of his right to confront the witnesses against him, that the prosecution was biased and that the government's inflammatory summation deprived

him of a fair trial. We find all of Wright's contentions to be without merit and affirm for the reasons discussed below.

Wright argues that the evidence was not sufficient to support a conviction on either the Hobbs Act count or the conspiracy count. He claims that there was no proof that he demanded anything from BRL under color of official right. Rather, Wright insists that the evidence shows nothing more than a request by him for an increase in the honorarium that he was to be paid for his appearance at the BRL conference. He contends that such an innocent attempt to negotiate a fee to which he had a legal right cannot constitute a violation of the Hobbs Act. Likewise, Wright contends that the conspiracy conviction must be reversed because there was no proof of an agreement, express or implied, between Wright and BRL to defraud the United States.

We disagree with Wright's characterization of the case against him and conclude that the evidence, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), was sufficient to support the jury's verdict.

In late 1972 or early 1973, James Phipps, then the Divisional Marketing Director of BRL and responsible for sales in the Northeast region of the country, invited Wright to speak at a conference to be held by BRL on February 1 and 2, 1973 at a hotel in San Francisco. Wright accepted the invitation and delivered a forty-five minute address on February 2. The other speakers at the conference were the education editor of Newsweek magazine, the president of the American Federation of Teachers, the director of the Experimental School Program of the National Institute for Education and John Tunney, United States Senator from California.

Phipps received a telephone call from Wright on February 3, as a result of which they later engaged in a conversation in the lobby of the hotel. Phipps testified that Wright asked whether the honorarium he was to receive could be increased. During the same conversation, Wright referred to the expenditures that would be incurred in conducting a successful election campaign and mentioned that people in the district which he represented found it very difficult to raise funds. However, when Phipps was asked on the witness stand whether Wright asked "for anything with regard to the funds necessary to run a political campaign," he responded, "Not specifically, no."

Phipps subsequently conveyed the substance of his conversation with Wright to Bert Parker, BRL's Vice President for Marketing. Allan Calvin, Chairman of the Board of BRL, testified that Parker then informed him that Wright had requested a $5,000 cash political contribution.[1] As a result of his conversation with Parker, Calvin asked Phipps to request Herbert Corbin, president of Kanan, Corbin & Shupack ("KCS"), BRL's public relations firm, to "generate the cash for the political contribution." Corbin resisted the request, but after a conversation with Parker, he agreed that KCS would issue a $5,500 check to Wright if BRL would first issue a check for that amount payable to KCS.

Meanwhile, Roger Sullivan, the president of BRL, had approved four separate check request forms to pay the conference speakers. (Senator Tunney's agent previously had been paid $2,500, of which the Senator was to receive $1,500.) One request form, in the amount of $700, was for the Newsweek education editor. The other three, including Wright's, were each in the amount of $500. Four checks were drawn on BRL's account at the United California Bank, but all were voided on February 12, before they could be delivered. On that same day, BRL issued a $5,500 check to KCS. The request for this check was not a printed form, but instead a handwritten page from the memo pad of Carl Peters, BRL's Comptroller, containing the words

---

1. This and other testimony was admitted under Fed.R.Evid. 801(d)(2)(E) as the statement of a co-conspirator, subject to subsequent proof of the existence of the conspiracy. Wright does not contend that the testimony was not admissible under the rule.

"$5,500.00 Herb Corbin." Three days later, Sullivan approved a printed check request form in the amount of $1,700 payable to KCS. This form included a handwritten list of the other three speakers and the same amounts as requested in the original individual forms. A check for $1,700 was issued to KCS, which in turn issued separate $500 and $700 checks to the three speakers.

On February 14, KCS issued a $5,500 check payable to Wright. Corbin gave this check to Phipps, who delivered it to Wright's office. Phipps testified that he handed the check to Wright, who in return gave him a letter of intent which indicated that Wright's school district was interested in renewing and expanding the program that it had purchased from BRL. Calvin and Parker were dissatisfied with this first letter and sought to obtain a stronger one. A second letter of intent bearing Wright's signature and dated February 23 was subsequently delivered to BRL. Both of these letters violated a directive of the Chancellor of the Board of Education of the City of New York, which forbade the issuance of letters of intent without the Chancellor's approval.

In August 1973, Community School Board 23 approved the purchase of an expanded program from BRL. The vote was five to four, with Wright and the other four board members who had run for election as part of his slate casting the votes in favor of the purchase. The funds used to purchase the program were provided by the federal government under Title I of the Elementary and Secondary Education Act of 1965.

This court in *United States v. Trotta*, 525 F.2d 1096, 1100 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), approved the Seventh Circuit's description of the offense of extortion under color of official right as set forth in *United States v. Braasch,* 505 F.2d 139, 151 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975):

> The use of office to obtain payments is the crux of the statutory requirement of "under color of official right" . . .

It matters not whether the public official induces payments to perform his duties or not to perform his duties . . . . So long as the motivation for payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951.

The trial judge here correctly instructed the jury that § 1951

> would not bar the payment to, and receipt by defendant of an honorarium or speaking fee, unless you are satisfied beyond a reasonable doubt that the payment focused on his public office and ability to aid B.R.L. and the defendant knew that that was the reason the money was paid to him.

 Appellant asserts that the evidence failed to establish that he *demanded* a cash political contribution. He argues that a strictly voluntary payment by BRL would not amount to extortion within the meaning of 18 U.S.C. § 1951, citing *United States v. Hathaway,* 534 F.2d 386 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). He further contends that we need only look to the Phipps-Wright conversation in the hotel lobby to determine whether or not there was proof of a demand under color of official right. We decline, however, to view the proof so narrowly, for it is settled law that the evidence "must be viewed in light of the totality of the Government's case, since one fact may gain color from others." *United States v. Tramunti,* 500 F.2d 1334, 1338 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

The jury properly could have found Wright guilty beyond a reasonable doubt of a violation of the Hobbs Act. Phipps' testimony that Wright did not specifically ask for a political contribution did not preclude the jury from reaching such a verdict. The jury would have been justified in giving weight to Phipps' testimony that Wright spoke of the difficulties of campaign fundraising. They could have concluded, as did BRL, that Wright was seeking to use the power of his public office to obtain $5,000 in addition to the concededly legal $500 honorarium. Wright's assertion of his innocent

motives is further undercut by the simultaneous exchange of the $5,500 check for the first letter of intent. In addition, Wright's action in providing both letters of intent in contravention of an explicit directive of the Chancellor of the Board of Education supports a conclusion that the letters and Wright's successful efforts to increase the district's purchases from BRL were part of a *quid pro quo* involving the additional $5,000.[2]

■ The indictment also charged Wright with conspiring with BRL to defraud the United States by depriving it of "the impartial, fair and honest distribution of federal funds and of the faithful and honest participation of the Board of Education of the City of New York in the financial grant program under Title I of the Elementary and Secondary Education Act of 1965," in violation of 18 U.S.C. § 371.

Wright contends that there was no proof that he agreed with BRL to defraud the United States. We disagree. The agreement which constitutes the essence of a conspiracy need not be explicit, but can be inferred from the facts and circumstances of the case. *Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1289, 43 L.Ed.2d 616 (1975); *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *United States v. Green,* 523 F.2d 229, 233 n. 5 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). The facts which we have already discussed were sufficient to support a finding that Wright implicitly agreed to exercise the powers of his office to bring about the expenditure of federal funds for continued and expanded purchases from BRL in return for BRL's additional $5,000 payment to him.

■ Wright next contends that the government's failure to provide use immu-

nity to Parker, pursuant to 18 U.S.C. §§ 6001–6003, deprived appellant of his right to due process guaranteed by the fifth amendment. He concedes that the decision to confer immunity ordinarily is within the sole discretion of the prosecutor. *United States v. Lang,* 589 F.2d 92 (2d Cir. 1978); *United States v. Housand,* 550 F.2d 818 (2d Cir.), *cert. denied,* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977). But, citing *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976), Wright argues that under extraordinary circumstances, due process may require that the government confer use immunity on a witness for the defendant.

Wright alleges that such extraordinary circumstances existed here. He contends that Parker was "perhaps the most critical witness" against him in that Parker's alleged out-of-court statement to Calvin constituted the only evidence that Wright had demanded a political contribution from BRL. Wright notes that Calvin testified that in his presence Parker denied having transmitted any such demand for money. Thus Wright argues that Parker's own testimony in court was essential to provide him with a fair trial. He contends that the government's refusal to confer use immunity deprived him of that testimony, because Parker's attorney said that without such immunity Parker would claim his fifth amendment right against self-incrimination and refuse to testify.

Our summary of the evidence, set out above, makes clear that Parker's extra-judicial statement in fact was not the only, nor even the most important, evidence that Wright extorted money from BRL. But we do not find it necessary to decide under what circumstances, if any, due process would require the government to confer use immunity on a witness at the request of a defendant.[3] For we conclude that Wright

---

**2.** Evidence of such a *quid pro quo* may be forthcoming in an extortion case, although it is not an essential element of the crime. *United States v. Trotta,* 525 F.2d 1096, 1100 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

**3.** Courts which have confronted this question have reached a variety of results. *Compare, e. g., United States v. Morrison,* 535 F.2d 223, 229 (3d Cir. 1976) (immunity required because of prosecutorial misconduct), and *Earl v. United States,* 124 U.S.App.D.C. 77, 80 n. 1, 361 F.2d

failed to make a sufficient showing that he desired to have Parker testify and that Parker would refuse to testify without use immunity.

After Corbin testified that Parker had denied transmitting Wright's demand to Calvin, appellant's counsel obtained from the government Parker's address in Oregon and the name of his attorney in New York. Appellant's counsel later told the court that he had spoken by telephone with Parker's attorney who asserted that Parker would not speak with Wright's lawyer and that Parker would "take the Fifth Amendment" if Wright subpoenaed him. Wright's counsel then said that if he subpoenaed Parker, he would ask the government to confer immunity on him. The trial court urged appellant's counsel to issue a subpoena as soon as possible. Counsel indicated that he would do so. At that point, the prosecutor informed the court that he did not intend to seek a grant of use immunity for Parker because he did not believe such a grant to be "in the public interest" as required by 18 U.S.C. § 6003(b)(1).[4] On the following day, however, the prosecutor offered to provide Parker with informal "letter immunity,"[5] the type of immunity which had been granted to a number of the government's witnesses. He also stated that if Parker found that proposal unacceptable, he would attempt to obtain authorization from the Justice Department for an application for use immunity,[6] despite his own belief that the request would not satisfy the Department's criteria.

On the next day, Wright's attorney informed the court that he had again spoken with Parker's attorney, who stated that he (Parker's attorney) would not be satisfied with letter immunity and that he would insist on "full-blown immunity." Wright's attorney then told the court that "as a result, I am not wasting any money to subpoena his client." The record discloses no further communications between Wright's counsel and either Parker or his attorney. No subpoena was issued.

We conclude that Wright failed to establish the need for a grant of use immunity to Parker. Wright argues that the proposition "that there was an insufficient basis on which to apply for statutory immunity . . is clearly without merit," because 18 U.S.C. § 6003(b)(2) provides that an application for immunity can be made where an individual "has refused or is likely to refuse to testify." This argument falls wide of the mark because the issue presented here is not whether the government had the *power* to apply for a grant of immunity, but rather whether it had an *obligation* to do so. We hold that it did not.

The key question raised by Wright's due process claim is whether the failure to grant immunity denied him a fair trial. Because Wright failed to subpoena Parker and to prove any need for use immunity, he cannot now demonstrate that the refusal to confer immunity prejudiced his trial. Here, as in *United States v. Carman,* 577 F.2d 556, 561 (9th Cir. 1978), the appellant's argument "is based purely on speculation as to what [the witness] would do *if called to*

---

531, 534 n. 1 (1966) (immunity might be required if government granted it to its own witness), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967), *with United States v. Ramsey,* 503 F.2d 524, 532 (7th Cir. 1974) ("no merit to the argument" that defendant has constitutional right to immunity for his witness), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975).

4. 18 U.S.C. § 6003(b) provides that:
 A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

(1) the testimony or other information from such individual may be necessary to the public interest . . . . .

5. Letter immunity consists of a promise by the particular United States attorney not to prosecute the witness for his participation in the transaction about which he testifies. The government now contends that this promise would have been enforceable against United States attorneys in other districts as well.

6. 18 U.S.C. § 6003 requires that a local United States attorney obtain approval of a request for an order compelling testimony pursuant to a grant of use immunity. See note 4, *supra.*

the stand." (Emphasis in original.) It is true that Parker's attorney asserted that his client would not testify without use immunity. But without calling Parker to the witness stand, "neither [the appellant] nor anyone else could be certain that [the witness] would assert his right against self-incrimination." *Id.* It is not improbable that Parker, for reasons of his own, might have preferred to avoid having to travel from Oregon to New York in order to testify about his role in the payment to Wright. Whether Parker would have maintained the position that his attorney asserted, had he actually been subpoenaed and called to the stand, is a matter of speculation upon which this court cannot base a finding that Wright was denied his due process right to a fair trial.

Wright also suggests that the refusal to grant immunity violated his sixth amendment right to have compulsory process for obtaining witnesses in his favor. A claim that the use immunity statute is unconstitutional because witnesses and defendants are not authorized to compel testimony on the same basis as the government was rejected in *In re Kilgo,* 484 F.2d 1215, 1222 (4th Cir. 1973), where the court said:

> The sixth amendment assures an accused "compulsory process for obtaining witnesses in his favor." But the authors of the Bill of Rights did not deem it essential to enhance this right by empowering the accused to confer immunity, and nowhere in the Constitution do we find any justification for conditioning the government's ability to grant immunity on a corresponding grant to private individuals.

It has also been held that the sixth amendment imposes no obligation on the government to confer immunity on a witness at the defendant's request. *United States v. Alessio,* 528 F.2d 1079 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *compare, United States v. La-*

*couture,* 495 F.2d 1237 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *see generally Kastigar v. United States,* 406 U.S. 441, 443–47, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). *But see United States v. Leonard,* 161 U.S.App.D.C. 36, 66 n. 79, 494 F.2d 955, 985 n. 79 (1974) (Bazelon, C.J., concurring in part and dissenting in part); *United States v. La Duca,* 447 F.Supp. 779, 787 (D.N.J.1978) (dictum).

We need not determine whether the sixth amendment might ever require the government to confer immunity on a defense witness. Wright did not avail himself of the compulsory process to which he clearly was entitled, the right to subpoena Parker. He cannot now complain that he was denied whatever other rights he might have had under the compulsory process clause, had his unexercised right of subpoena proved unavailing.

■ We next consider Wright's argument that he was denied his sixth amendment right to confront the witnesses against him when the government failed itself to call Parker as a witness after the admission of the extra-judicial statement. He argues that Parker's statement was crucial to the government as well as devastating to the defense and that there was nothing inherently reliable about the statement.

Wright does not claim on appeal that Calvin's testimony reporting Parker's statement did not satisfy the requirements of Fed.R.Evid. 801(d)(2)(E), as the statement of a co-conspirator. That the testimony was admissible under the rules of evidence does not, however, conclude our inquiry, but merely turns our attention to the constitutional issue involved. The confrontation clause is not merely the equivalent of the hearsay rules. *Dutton v. Evans,* 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).[7]

---

**7.** The Supreme Court in *Dutton* characterized the co-conspirator rule as a hearsay exception. The new Federal Rules of Evidence adopted the opposing view that the statement of a co-conspirator simply does not come within the definition of hearsay. This change in terminology has no significance for the purpose of determining whether admission of a statement into evidence satisfies the confrontation clause.

The Supreme Court has not ruled upon the interrelation of Rule 801(d)(2)(E) and the confrontation clause. Some circuits have adopted the position that a statement of a co-conspirator admissible under Rule 801(d)(2)(E) per se satisfies the requirements of the confrontation clause. *United States v. Johnson,* 575 F.2d 1347 (5th Cir. 1978); *United States v. Papia,* 560 F.2d 827 (7th Cir. 1977); *Ottomano v. United States,* 468 F.2d 269 (1st Cir. 1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973). This court, however, previously has concluded that *Dutton* mandates a case-by-case examination to determine whether the defendant's right of confrontation has been abridged. *United States v. Puco,* 476 F.2d 1099 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973); *accord, United States v. Davis,* 578 F.2d 277 (10th Cir. 1978); *United States v. Kelley,* 526 F.2d 615 (8th Cir. 1975), *cert. denied,* 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976); *United States v. Snow,* 521 F.2d 730 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976).

In *Puco,* 476 F.2d at 1103, we read the plurality opinion in *Dutton* as indicating that "the presence of sufficient 'indicia of reliability' may, in some circumstances, permit the prosecution to introduce out-of-court statements into evidence even though the declarant is available to it and the defendant has never had an opportunity to cross-examine him." We held that this rule applied at least where the statement is not "crucial" to the prosecution or "devastating" to the defendant.

We believe that Parker's extra-judicial statement bore sufficient indicia of reliability to assure that "the trier of fact [had] a satisfactory basis for evaluating the truth of the prior statement." *Dutton v. Evans, supra,* 400 U.S. at 89, 91 S.Ct. at 220, quoting *California v. Green, supra,* 399 U.S. at 161, 90 S.Ct. 1930. In *Puco,* we suggested that "[i]n most cases the determination that a declaration is in furtherance of the conspiracy . . . will decide whether sufficient indicia of reliability were present. While there may be exceptions, we do not think that they will be frequent." 476 F.2d

at 1107–08. There is nothing that would lead us to conclude that Parker's statement is one of those exceptions. First, the possibility that Parker was relying on faulty recollection is remote. He made the statement to Calvin either the same day as or the day after he learned of Wright's desire to obtain $5,000. Second, the circumstances were such that there is no reason to believe that Parker misrepresented what Phipps told him. Parker had no motive to want his superiors to believe that Wright was seeking a political contribution if in fact he had asked only for an honest renegotiation of his honorarium. Lastly, the circumstances and general nature of Parker's statement are corroborated by other testimony of witnesses who were subjected to substantial cross-examination. Phipps confirmed that a meeting with Wright took place after the conference. Phipps also testified that he conveyed his conversation with Wright to Parker, telling him that Wright had "intimated . . . that he was hopeful of getting a substantial amount of money." Calvin testified that he asked Phipps to contact Corbin and to arrange "for the political contribution to Mr. Wright" and that Phipps replied that he would do so. Corbin testified that first Phipps and then Parker telephoned him to arrange the issuance of the $5,500 check. As a result of all these factors, we believe that the jury could adequately weigh the credibility and importance of Parker's statement.

We also conclude that Parker's statement was neither "devastating" nor "crucial." As we said in *Puco,* 476 F.2d at 1104, "Admittedly, these terms do not offer a precise standard, but we interpret them as requiring that the evidence be in some way essential, indeed central, to the prosecution's case." Our review of the evidence has demonstrated that there was a sufficient basis for the jury to convict Wright on both counts without any reference to Parker's statement. Wright argues that the statement is crucial because it was the only evidence that he demanded a "political contribution." We have already stated that it was not necessary that the government

show that Wright asked for a contribution *in haec verba* and that the jury could infer an extortive demand from the testimony of Phipps and the surrounding circumstances. Finally, appellant's attempt to place importance on the use of the words "political contribution" is defeated by his own success in cross-examination of Calvin, during which the witness conceded that he did not recall the exact words that Parker had used. In light of these facts, we cannot conclude that the out-of-court statement was in any way crucial or essential to the government's case. Thus no error was committed in allowing the testimony without an opportunity to cross-examine Parker.

▇ Wright's two remaining grounds of appeal require little comment. We do not condone the prosecutor's repeated use of the term "preparations man" in referring to Wright's experience in preparing cases for trial while employed in the office of the Corporation Counsel of the City of New York. These references may have crossed "the exceedingly fine line which distinguishes permissible advocacy from improper excess." *United States v. White*, 486 F.2d 204, 207 (2d Cir. 1973), *cert. denied*, 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974). But viewed in the context of a summation which totaled several hours at the conclusion of a rather long and hotly contested trial, whatever inappropriate comments were made did not deprive the defendant of a fair trial, and thus reversal is not warranted. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239, 242, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. White, supra*, 486 F.2d at 207.

▇ The district court properly rejected Wright's claim that the prosecution against him was biased because the wife of the Assistant United States Attorney who presented this case to the grand jury was allegedly a political opponent of Wright. The Justice Department's Counsel on Professional Responsibility reviewed the investigation and concluded that there had been no misconduct. We agree that no showing of bias of the prosecutor was made here. The American Bar Association Standards Relating to the Prosecution Function, § 1.2, provides that "A conflict of interest may arise when, for example, . . . a business partner or associate or a relative has any interest in a criminal case, either as a complaining witness, a party or as counsel." None of these circumstances was present here. We find no impropriety or appearance of impropriety.

The judgment is affirmed.