**UNITED STATES of America, Plaintiff,**

v.

**DE PALMA et al., Defendants.**

**78 Cr. 401 (RWS).**

United States District Court,
S. D. New York.

Aug. 15, 1979.

Nathaniel H. Akerman, Asst. U. S. Atty., Robert B. Fiske, Jr., U. S. Atty., New York City, for plaintiff.

Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City, for defendants; Jonathan

W. Lubell and Mary K. O'Melveny, New York City, of counsel.

## OPINION

SWEET, District Judge.

After having been found guilty by jury verdict on all counts with which he was charged,[1] defendant Leonard Horwitz ("Horwitz") moved in timely fashion for a judgment of acquittal pursuant to Rule 29, Fed.R.Crim.P. or, in the alternative, for a new trial pursuant to Rule 33, and for such other relief as might be found appropriate. With the exception of that part of the application dealing with the asserted denial of due process, Horwitz's motions are denied because no significant authorities have been suggested by Horwitz other than those previously considered and ruled upon by the court in connection with his prior motions.

Horwitz has asserted that he was denied due process of law in that he did not receive a fair trial because of the government's selective exercise of its statutory immunity power. In short, Horwitz claims that the government's broad conferral of transactional immunity on key witness and co-conspirator Norman Brodsky ("Brodsky") was improper in the face of its refusal to grant even a limited use immunity[2] to potential witnesses Jay Emmett ("Emmett") and Solomon Weiss ("Weiss"), whose testimony would have tended to exculpate Horwitz had they not asserted their Fifth Amendment privilege against self incrimination.[3] Horwitz is entitled to relief on this ground.

Although this is the first occasion on which this issue has been presented in this context, the court has previously issued a written opinion dealing with related questions. See opinion in this action dated December 21, 1978. At the close of the prosecution's case in the first trial (which resulted in a mistrial when the jury was unable to agree on a unanimous verdict) Horwitz moved for a judicial grant of immunity to Emmett and Weiss or for admission into evidence of Emmett and Weiss' grand jury testimony pursuant to Rule 804(b)(5), Fed. R.Evid. In its December 21, 1978 opinion the court denied that motion, noting that it had to consider what was in the "interests of justice," and that one relevant factor was "the use by the government of a grant of immunity to its witnesses and its denial of such a grant to the witnesses sought to be called by Horwitz." December 21, 1978 opinion at 2.[4] At the second trial, Horwitz subpoenaed Emmett and Weiss, who took the stand and on the advice of counsel,

1. The indictment charged Horwitz as follows: in Count One he was alleged to have conducted the affairs of the Westchester Premier Theatre ("the Theatre") through a pattern of racketeering. In Count Two he was alleged to have conspired to violate federal securities laws with respect to the sale of stock of the Theatre. In Counts Three through Eleven he was alleged to have defrauded purchasers of Theatre stock. In Count Twenty-four he was alleged to have endeavored to obstruct a Grand Jury investigation.

2. For definitions of use immunity and transactional immunity see United States v. Morrison, 535 F.2d 223, 229 (3d Cir. 1976) and Kastigar v. United States, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed. 212 (1972). See also United States v. Rocco, 587 F.2d 144, 147 n. 9 (3d Cir. 1978).

3. It is important to note what is not at issue here: that the decision to grant immunity is ordinarily within the sole discretion of the prosecutor, see United States v. Wright, 588 F.2d 31, 35 (2d Cir. 1978); that there is no obligation on the United States Attorney to seek immunity for witnesses, see United States v. Lang, 589 F.2d 92, 96 (2d Cir. 1978); and that a district court has no independent power to grant immunity to a witness whose testimony a defendant may wish to offer, see e. g. United States v. Jenkins, 470 F.2d 1061, 1063 (9th Cir. 1973); In Re Daley, 549 F.2d 469, 479 (7th Cir. 1977).

4. In the cited opinion the court denied, sub silentio, Horwitz's motion for a judicial grant of immunity to Emmett and Weiss on the ground that it lacked the power to do so. For authorities supporting this conclusion see footnote 3 hereof. The court also denied Horwitz's motion that Emmett and Weiss' grand jury testimony, which was hearsay, be admitted into evidence pursuant to Rule 804(b)(5), Fed.R. Evid. The basis for this latter decision was that "[t]he complicated interplay of rights, those of the Government, of the defendant Horwitz, and the witnesses who now claim their Fifth Amendment privilege, do not permit a clear enunciation of the interests of justice sufficient to involve the exception of Rule 804(b)(5)." December 21, 1978 opinion at 3.

invoked their Fifth Amendment privilege. The court inquired of the prosecution whether it would be willing to grant a limited use immunity to Emmett and Weiss on the condition that their testimony be confined to matters highly relevant to material issues. The prosecutor responded in the negative, stating that both witnesses were the subject of a continuing investigation.

Horwitz and his co-defendants have, throughout both trials, set forth a number of instances of alleged prosecutorial misconduct other than the government's selective exercise of its immunity power. Indeed, certain admissions of the defendant Eliot Weisman ("Weisman") were suppressed after an improper arrest. As far as Horwitz was concerned, however, the circumstances relating to his arrest and grand jury testimony, the use of Brodsky as a government agent to entrap him, and the publicity given to Emmett's and Weiss' exercise of their privilege, as described above, were all matters which, even collectively, neither rise to the level of prosecutorial misconduct sufficient to provide a ground for the relief herein granted nor compel a finding that the prosecutor acted in bad faith or with a bad intent with respect to Horwitz.[5]

Horwitz was deprived of the due process of law because broad immunity was granted to government witness, Brodsky and, to a lesser extent, Kosman,[6] while two witnesses to the events at issue sought to be called by Horwitz were unavailable because of the government's failure to grant them even limited use immunity.

As indicated in the court's December 21, 1978 opinion, the principal evidence against Horwitz was provided by Brodsky and Kosman.[7] As discussed more fully below, both Brodsky and Kosman were granted immunity,[8] and the major thrust of their testimony against Horwitz was that Horwitz stated that he had paid money to Emmett and Weiss to induce them to cause Warner Communications, Inc. ("Warner") to purchase shares of stock in the Westchester Premier Theatre ("the Theatre") an inducement which was concealed from the investing public. The unfairness stemming from the government's refusal to grant even a limited use immunity to Emmett and Weiss is brought into relief by reviewing the evidence against Horwitz and the government's grant of immunity to its own witnesses.

5. Furthermore, no finding of bad faith or intent on the part of the prosecutor is made by the court in connection with the disposition of this motion.

6. Although Kosman testified that he thought he had received immunity (see text following footnote 10), this is contradicted by a letter to the court from Assistant United States Attorney Akerman, dated July 9, 1979. This letter indicates that Kosman "received leniency, not immunity, in the form of a plea to a three year felony." The underlying agreement referred to by Mr. Akerman is reflected in a letter dated June 22, 1978 from Mr. Akerman to John Doyle, Esq. (part of the "3500 material" with respect to Kosman). Kosman's testimony indicates that, at least in his own mind, Kosman thought he was testifying pursuant to an immunity grant. Even assuming that Kosman was incorrect in his belief, what is important for present purposes is that the testimony by Kosman was given while he thought immunity had been provided, primarily because that belief may have colored Kosman's testimony.

7. For a discussion of the evidence provided by Carino, see text, supra. The evidence against Horwitz brought out by Carino, aside from that provided through Brodsky and Kosman, may not have been sufficient to survive Horwitz's motion pursuant to Rule 29, Fed.R.Crim.P. which was made at the close of the government's case. At any rate, Carino testified that one reason why he decided to cooperate with the federal authorities was "to try to reduce my jail sentence in Virginia and New Jersey." (Transcript at 1090). Part of Carino's plea arrangement was a promise by the government that Carino would not receive more than five years in jail for charges that he was pleading guilty to in New Jersey. Carino testified that he has "no immunity from any crimes that I divulge that come out in this case or any other case," but part of his plea agreement was "that the government will let it be known to anyone that I wish the extent of my cooperation. . . ." (Transcript at 1091). Thus, although Carino received no immunity for testifying, his testimony was, at least in part, induced by an expectation of some assistance by the government in ameliorating his sentence.

8. See footnote 6.

Brodsky testified that Horwitz was present at a meeting with Ferkoff and Roggen at which $220,000 in cash was presented in a black attache case. The cash was then used, according to Brodsky, to purchase stock in the public offering to enable the Theatre to reach the required minimum of subscriptions to complete the public offering. Brodsky also said that Weisman had told him that Horwitz had contacts at Warner, namely Emmett and Weiss, and that Warner's purchase of Theatre stock during the public offering was related to a $50,000 payoff to those Warner contacts.

According to Brodsky, a complicated set of transactions, briefly here described, involving Horwitz and Warner took place subsequent to the public offering by the Theatre: sometime after June 14, 1973, Horwitz negotiated a transaction which resulted in Warner's purchase of 20,000 shares of Theatre stock in the aftermarket. Horwitz stated that that transaction called for Warner to buy the 20,000 shares at $5 per share and to make an additional $50,000 payment by means of checks. Horwitz allegedly told Brodsky that a problem had arisen in connection with deciding to whose order such Warner checks should be drawn. Brodsky testified that Horwitz told him that it was decided that Warner would pay the $50,000 as follows: (1) a $10,000 check would be made payable to Horwitz; (2) a $10,000 check would be made payable to Kosman or to someone else; and (3) a $30,000 check would be made payable to the Theatre. Regarding the $30,000 check, however, Brodsky testified that Horwitz and he (Brodsky), and possibly Weisman, subsequently decided that it should be made payable to Dennis Konner (Brodsky's law partner) and that in that connection a bill would be submitted by Konner to Warner. Horwitz allegedly also told Brodsky that in return for causing Warner to purchase the 20,000 shares in the aftermarket, Emmett wanted $20,000 in cash, and Emmett and Weiss wanted additional money to be paid

to them at a later date. According to Brodsky, when Horwitz related that the Warner officials wanted the $20,000, Brodsky overdrew his checking account, put the cash in a paper bag, and gave it to Horwitz. The government placed in evidence the checks allegedly cashed by Brodsky in this connection.

Brodsky further testified that when he first discussed the Warner transactions with the government, he mistakenly said that he had been present when Weisman gave Horwitz $50,000 in connection with Warner's original purchase of Theatre stock. Brodsky's recollection was refreshed, so he said, by his viewing certain documents shown to him by the government. Until he saw those documents he had only a hazy recollection of the transaction.

There was also testimony by Brodsky with respect to a request by Horwitz that Brodsky give to Aaron Gottesman $7,500 of a $15,000 debt owed by Brodsky to Horwitz.[9]

Other evidence against Horwitz with respect to the securities counts was provided by Kosman, who worked at the Theatre with Horwitz in group and corporate sales. Kosman testified that Horwitz had told him in 1973 that he (Horwitz) had taken an active role at the Theatre and he (Horwitz) had friends and associates—including Emmett, Gottesman, and others—who bought Theatre stock during the public offering. Kosman also gave testimony which tended to corroborate Brodsky's testimony concerning purchases of Theatre stock by Warner in the aftermarket. Kosman also testified that Horwitz had told him that because Malcolm Tarloff, a Connecticut insurance agent, had purchased Theatre stock during the public offering, he would be given an opportunity to sell a life insurance policy on Weisman's life. Finally, Kosman testified about a conversation he had with Horwitz after the public offering, wherein Horwitz

---

**9.** The Indictment charged that Gottesman was involved in the securities violations by Horwitz and his co-defendants and that Gottesman received from Horwitz the check for $7,500 in connection with a prior arrangement pursuant to which Gottesman purchased 1,000 shares of Theatre stock for $7,500 during the public offering.

stated that he was nervous about Harry Lipsig, who hadn't received certain additional Theatre stock which he had been promised, according to the government at the time of the public offering.

Other evidence against Horwitz on the securities and securities conspiracy counts consisted of (i) testimony by Ross Carino ("Carino") about a conversation, which took place in an automobile in which Horwitz told Carino that he was on his way to an appointment with a Warner official, and that Emmett would probably get involved in having Warner purchase Theatre stock because Emmett needed money; (ii) statements made by Horwitz and recorded by Brodsky; and (iii) certain documents, such as a July 3, 1973 check for $20,000 drawn by Warner and payable to Horwitz.

With respect to the obstruction of justice count, the principal evidence against Horwitz consisted of testimony by Brodsky and tape recordings made by Brodsky. Kosman also testified on the subject as a government witness.

Brodsky testified that in addition to recording his conversations with Horwitz he met with Horwitz at Weisman's suggestion in the fall of 1977 and that Horwitz said that it wasn't his (Horwitz's) place to question Emmett and Weiss' actions in connection with the grand jury investigation, and that they should keep in close contact so that they could get together on their grand jury stories if something were to happen.

The broad transactional immunity granted to Brodsky, including all crimes which he had committed, whether or not known to the government at the time of the grant, was such that he was induced to become not only a government witness, but also to be an active government agent who taped statements made by Horwitz. Brodsky testified that the government had informed him that in order to secure immunity he would have to wear a body recorder and secure certain evidence while functioning as a government agent. In Brodsky's words, "The government told me that they would need to get Warner Communications and their executives, and after I told them the story about the payoffs to Warner, they wanted me to be wired to induce Mr. Horwitz to tell me the stories about Warner Communications." (Transcript at 2182). Brodsky added that, of the Warner executives mentioned by the government, the focus "was mostly Jay Emmett." (Transcript at 2183). As a result of these conversations with the government, Brodsky testified he believed that in order to be immunized he would have to tape a conversation of Horwitz describing "what happened with the executives at Warner Communications. . . ." (Transcript at 2183). Brodsky was "willing to go to any lengths to do it." *Id.* Brodsky's incentive for going "to any lengths" became apparent when he was asked on cross examination if the jail terms to which he was exposed by past crimes "could encompass at least a couple of hundred years in jail?", and he replied: "Probably a couple of thousand." (Transcript at 2116).

The plea agreement apparently granted to Kosman was not quite as broad as the immunity given to Brodsky, but was still significant. Kosman testified that although he was not clear on its precise contours, he did not expect to be prosecuted based on information given in this courtroom, that he would not be prosecuted for crimes relating to the Westchester Premier Theatre, and that the prosecutor would inform the sentencing judge (in an unrelated prosecution) of his cooperation here. (Transcript at 2673, *et seq.* and 2727, *et seq.*).[10]

A review of the grand jury testimony of Emmett and Weiss,[11] for example at pages 31, 32, 87, 98 and 117, and of a December 10, 1978 affidavit submitted by Horwitz's counsel demonstrates that their testimony would have been probative and not cumula-

10. See footnote 6 and text accompanying that footnote.

11. The court reviewed the transcript of this grand jury testimony *in camera* subsequent to the court's *sua sponte* request that Assistant United States Attorney Akerman make it available.

tive. *Cf. United States v. Alessio*, 528 F.2d 1079, 1082 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976) (defendant not denied a fair trial where testimony sought by defendant would have been cumulative).

Both the government and Horwitz agree that the seminal opinion on this issue is *Earl v. United States*, 124 U.S.App.D.C. 77, 361 F.2d 531 (D.C.Cir.1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967), wherein the Chief Justice Warren Burger, then a circuit judge, remarked in a footnote:

> We might have quite different, and more difficult, problems had the Government in this case secured testimony from one eyewitness by granting him immunity while declining to seek an immunity grant for Scott to free him from possible incrimination to testify for Earl. That situation would vividly dramatize an argument on behalf of Earl that the statute *as applied* denied him due process. Arguments could be advanced that in the particular case the Government could not use the immunity statute for its advantage unless Congress made the same mechanism available to the accused. . . .

*Id.* at 534 n. 1. The question posed by the *Earl* court in the above-quoted footnote was raised only hypothetically because the government had not granted immunity to any of its own witnesses.

The Court of Appeals for the Second Circuit has twice referred to the quoted footnote in *Earl* but has not yet been presented with the issue on facts similar to those here. In *United States v. Lang*, 589 F.2d 92 (2d Cir. 1978), the court stated that it did not reach the issue because "as in *Earl*, we have no such problem since the Government did not offer immunity to any witness." *Id.* at

96, n. 1. In *United States v. Wright*, 588 F.2d 31 (2d Cir. 1978) the Court of Appeals stated: "we do not find it necessary to decide under what circumstances, if any, due process would require the government to confer use immunity on a witness at the request of a defendant." *Id.* at 35. (Footnote omitted). In *Wright* the Second Circuit did not feel compelled to decide "whether the failure to grant immunity denied [defendant] a fair trial," because the defendant "failed to subpoena [the potential witness]" and did not prove "any need for use immunity." *Wright*, 588 F.2d at 36. Unlike *Lang*, the government here did offer immunity to its own witnesses. Unlike *Wright*, the defendant here did subpoena the potential witnesses, did show the need for use immunity, and did call Emmett and Weiss to the stand so as to make certain that they would assert their right against self-incrimination.

The Second Circuit, in *Wright*, noted that other courts which have addressed the issue here presented have "reached a variety of results." 588 F.2d at 35 n. 3. For example, the Court of Appeals for the Ninth Circuit has suggested that when the government relies on the testimony of immunized witnesses, fundamental fairness may require a grant of immunity for defense witnesses. *Alessio, supra*, 528 F.2d at 1081–82.[12] *See also United States v. Bautista*, 509 F.2d 675, 677 (9th Cir. 1975); *United States v. Jenkins*, 470 F.2d 1061, 1064 (9th Cir. 1972). The Court of Appeals for the Third Circuit has recently indicated that a conviction may be overturned on the ground asserted by Horwitz, although the court indicated that the evidentiary showing required in order for a court to reach that result must be "substantial." *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978).[13] *See*

---

12. The *Alessio* court remarked:

> Of course, whatever power the government possesses may not be exercised in a manner which denies the defendant the due process guaranteed by the Fifth Amendment. The footnote in *Earl v. United States, supra*, on which appellant relies heavily says no more than this. The key question, then, is whether appellant was denied a fair trial because of

the government's refusal to seek immunity for defense witnesses.
528 F.2d at 1082.

13. The Third Circuit went on to state: "The defendant must be prepared to show that the government's decisions were made with the deliberate intention of distorting the judicial fact finding process." *Herman*, 589 F.2d at 1204 (citations omitted). This court expresses

also *United States v. Morrison*, 535 F.2d 223, 229 (3d Cir. 1976) (distinguishable from the instant case because of the presence of prosecutorial misconduct independent of the failure to grant immunity); *United States v. LaDuca*, 447 F.Supp. 779, 786–87 (D.N.J.) (Stern, J.), *aff'd. sub nom. United States v. Rocco*, 587 F.2d 144 (3d Cir. 1978).

 Central to the issue here presented is the question of what obligation is placed upon the government in connection with the search for truth in a criminal proceeding. While the government need not in every circumstance grant immunity to potential defense witnesses, here, where the foundation of the government's case against Horwitz was built by means of a far-reaching immunity grant, and where the evidence sought by the defense is affected by the government's continuing investigation of the potential defense witnesses, the denial of limited use immunity resulted in an unfair trial.

The issue of appropriate relief is, however, as troublesome as the constitutional issue already discussed. The alternatives to be considered in light of *United States v. Brown*, 602 F.2d 1073 (2d Cir. 1979), and other authorities are: (1) dismissal of the indictment[14] or (2) a retrial excluding the Brodsky testimony unless the government grants Emmett and Weiss the requested use immunity.[15]

 Dismissal of an indictment "must be reserved for extremely rare cases." *United*

*States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979). The remedy is justified:

> in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to "help to translate the assurances of the United States Attorneys into consistent performances by their assistants."

*United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978), *cert. denied*, ── U.S. ──, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

Dismissal of the indictment here would seem to satisfy the first of these objectives. The prejudice resulting to the defendant from the prosecutor's selective grant of immunity has been described. Moreover, this is not the type of situation recently considered in *United States v. Brown, supra*, in which "the most that can be said in support of the dismissal of the indictment . . . is that the government's case against Brown was suprisingly weak." at 1077. Rather, because of the manner in which immunity was granted, Horwitz was deprived of his due process rights, including his right to put any witness on the stand who was "capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1919 (1967).[16]

As noted, the dismissal of the indictment also might be used to deter a pattern of

---

no view concerning the general standard to be applied in determining whether a defendant has met his burden in asserting a claim on the ground discussed in this opinion. On the peculiar facts of this case, however, the court concludes that such burden has been met by Horwitz.

14. One issue that does not raise a problem, however, is double jeopardy. The decision to dismiss an indictment can be reviewed, *see United States v. Wilson*, 420 U.S. 332, 352–53, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), because if it is found that the government's actions were not violative of defendant's due process rights, the earlier verdict can be reinstated. Since such an order would not subject defendant to a second trial for the same offense, there would be no double jeopardy.

15. Horwitz's motion for acquittal under Rule 29, Fed.R.Crim.P., must be denied. Upon a motion for acquittal, if there is no evidence upon which a reasonable mind might fairly find guilt beyond a reasonable doubt, the motion must be granted. *United States v. DeGarces*, 518 F.2d 1156, 1159 (2d Cir. 1975); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). A review of the evidence reveals that in this case, a reasonable mind could conclude that Horwitz is guilty beyond a reasonable doubt and, of course, the jury did so conclude.

16. This necessarily includes the right to have witnesses testify regarding the absence of certain occurrences.

official misconduct but there has been no showing of any pattern outside of the confines of this action, in which the government's position has remained consistent during both trials. Nevertheless, it is noted that there is no indication that the government intends voluntarily to abandon its practice of selectively granting immunity, at least in this proceeding.

■ Although this court believes that dismissal of the indictment is warranted to eliminate the prejudice suffered by Horwitz, it is aware that this sanction is "the most drastic remedy." *United States v. Fields*, 592 F.2d at 647 (emphasis in original), and is to be used only "in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor." *Id.* at 648. In *United States v. Brown, supra,* the Court of Appeals recently noted that the prejudice to the defendant there was not of the type that should be cured by dismissal of the indictment. Rather, it suggested that the proper remedy would be suppression of the evidence during a new trial. slip op. at 3708.

■ Because the constitutional defect can be remedied, Horwitz's motion for a new trial is granted, and upon such retrial Brodsky's testimony will be excluded unless the requested use immunity is granted to Emmett and Weiss. The motion for a new trial is granted with much reluctance, because Horwitz has already endured two lengthy, costly trials and a third trial should not be required unless it is absolutely essential.[17] However, because the "interests of justice" are insufficient reason for dismissing an indictment, *United States v. Lai Ming Tanu*, 589 F.2d 82, 86 (2d Cir. 1978), and because it appears that these interests would best be served by a third trial with immunized testimony by witnesses from *both* sides, Horwitz's motion for a retrial is granted.

**17.** This court takes some comfort, however, from the knowledge that the government may appeal a decision to suppress the Brodsky evidence prior to the third trial. *See* 18 U.S.C. § 3731.