Mary **KIRKLAND**, Petitioner,

v.

**RAILROAD RETIREMENT BOARD**, Respondent.

**No. 1136, Docket 82–4201.**

United States Court of Appeals, Second Circuit.

Argued April 7, 1983.
Decided April 26, 1983.

**100**

Kenneth Kirschner, New York City (Breed, Abbott & Morgan, New York City, of counsel), for petitioner.

Michael C. Litt, Chicago, Ill. (Dale G. Zimmerman, Gen. Counsel, Edward S. Hintzke, Asst. Gen. Counsel, R.R. Retirement Bd., Chicago, Ill., of counsel), for respondent.

Before KAUFMAN, TIMBERS and NEWMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This case presents the sad circumstances of a seventy-nine year old woman, who, following three decades of marriage, became eligible to collect a widow's annuity. Soon she discovered that the benefits she had received were to be discontinued because the Railroad Retirement Board determined her marriage was void. In addition to the grave consequences of this decision, petitioner has been frustrated in her efforts to challenge the termination of her benefits, and has been forced to litigate this issue for over seven years. Because we believe the Board's decision was not supported by substantial evidence, we vacate the contested order.

I

The underlying facts are important to the resolution of this petition for review. Accordingly, we set them out in some detail.

In late 1940 Mary Townes met James Kirkland at a church outing in Stamford, Connecticut. Both were residents of New York City. Eventually, Townes and Kirkland began a courtship which culminated in their marriage on June 7, 1941.

At the time James Kirkland took his vows of faithfulness and loyalty, he was married to another woman. In 1933 he married Ruth Watkins in Orange, New Jersey, but evidently this union was not a happy one, for in 1936 Kirkland left Watkins and never lived with her again. James, however, never divorced Ruth, and accordingly, the validity of his subsequent marriage to Mary was open to question.

A crucial issue in this case is whether Mary Townes was aware of James's previous marriage when she married him in 1941. The Railroad Retirement Board ("Board"),

whose decision we shall discuss in some detail, concluded Mary was indeed, cognizant of her husband's prior marriage. Petitioner challenges this finding, asserting it is unsupported by the evidence on the record.

On June 6, 1941, one day before his marriage to Mary Townes, Kirkland attended a hearing of the Domestic Relations Court of New York City, where he agreed to pay his wife Ruth support payments totaling $5 every second week. Some time later, in February 1943, James was threatened with the possibility of imprisonment because he had been remiss in meeting his obligations to Ruth and their child. Mary agreed to guarantee her husband's payments and signed a suretyship contract. Several months later, in June 1943, Mary signed another agreement concerning her husband's support payments.

Ruth Watkins intruded on Mary and James's lives on only one other occasion. During Thanksgiving of 1943, Ruth appeared unannounced at the Kirklands' New York apartment with a concealed knife. She attacked James, stabbing him several times in the chest. James was hospitalized after this attack, and Ruth was arrested and eventually committed to the Pilgrim State Mental Hospital.

Mary and James lived together during the following 28 years, and enjoyed what appears, by all indications, to have been a happy marriage. Mary worked as a domestic and performed household chores. She also cared for James, and when he was hospitalized, visited him daily. James developed kidney difficulties in the latter part of his life, and Mary prepared special diets for him and otherwise attended to his needs. In February 1971 James died as a result of various ailments associated with his kidney disorders.

Shortly after James's death, Mary applied for a widow's annuity from the Railroad Retirement Board. The Board granted her request and commenced payment of the annuity. Mary also received social security payments based upon her employment history, and her stipend from the Board was reduced to account for this additional income. She was 71 years old when she began to receive her widow's benefits.

Mary continued to receive her monthly remuneration until September 1976, when she was informed by the Board's Director of Retirement Claims that it was being terminated, because the Board concluded Ruth Watkins was James's legal widow. Ruth had filed requests for benefits in 1975 and again in March 1976. Both requests, however, were denied because the Bureau of Retirement Claims determined that, despite Ruth's proof of her marriage to James, she was unable to rebut the presumption provided by New York law in favor of the validity of the subsequent marriage. Eventually Ruth provided additional evidence, and in September the Board reconsidered its previous decisions, granted Ruth an annuity and terminated Mary's benefits.

After the Board ceased payment of her annuity, Mary sought to have her benefits reinstated, and embarked on a course of litigation which was met by the Board's procrastination. Indeed, after more than seven years, several hearings, and a previous appeal to this Court, there has been no final resolution of this dispute.

## II

Mary's case was submitted to a Railroad Retirement Board appeals referee, Raymond Gliva, who considered documentary evidence as well as testimony from petitioner and other witnesses. After considering this evidence, Gliva determined it was sufficient to rebut the presumption in favor of the validity of the second marriage. He noted a comprehensive search of divorce records in New York, New Jersey and Connecticut failed to reveal any indication of a divorce between James and Ruth, and credited a statement by Frank Watkins, Ruth's brother, that he knew of no actions which had been taken to terminate his sister's marriage with James. The referee concluded that Ruth, and not Mary, was James's legal widow, and accordingly, only Ruth had a right to receive the widow's annuity pursuant to 45 U.S.C. § 231a(d).

Mary's counsel called Gliva's attention to this Court's decision in *Rosenberg v. Richardson,* 538 F.2d 487 (2d Cir.1976), where we concluded a subsequent spouse, who entered into a marriage in good faith, without knowledge of any previous marriage, could collect partial widow's benefits as a "deemed widow," although the legal widow was also collecting a partial annuity.. That *Rosenberg* concerned an interpretation of § 216(h)(1)(B) of the Social Security Act, 42 U.S.C. § 416(h)(1)(B), is not important for our purposes.[1] Section 2(d)(4) of the Railroad Retirement Act, 45 U.S.C. § 231a(d)(4), expressly incorporates that provision. Gliva, however, ignored this clear precedent, and concluded, without elaboration, "that the *Rosenberg* case is not the law as regards the Railroad Retirement Act and the Railroad Retirement Board."

The referee's decision was not filed until September 1979, almost exactly 3 years after Mary's benefits were terminated. She then appealed to the full Board, which filed an order in May 1980, upholding the referee's determination, adopting his findings concerning the status of Ruth Watkins as James's legal widow, and strongly criticizing the *Rosenberg* decision.

Mary Kirkland filed a timely petition with this Court, seeking review of the Board's order. During the pendency of that appeal, however, the Board sought to introduce new evidence which it asserted was relevant to the issue of Mary's good faith. In view of this allegedly new and important information, we vacated the order and remanded the matter to the Board, but also admonished respondent for its failure to follow established precedent. We stated, "Although we do not now reach petitioner's claim under *Rosenberg,* we express our strong disapproval of the Board's refusal to follow in this circuit law handed down by this court." *Kirkland v. Railroad Retirement Board,* 679 F.2d 873 (2d Cir. 1981) (unpublished order in these proceedings). The Board was directed to follow *Rosenberg* in future actions.

On remand the case was assigned to a hearing examiner, Thomas W. Sandler, who conducted a telephone conference with Mary and her attorney, and considered the massive amount of documentary evidence which had accumulated during the years of litigation. After examining the evidence and carefully weighing Mary's testimony, the examiner credited her statement that she had no knowledge of James's previous marriage, and accordingly, concluded she should be considered his "deemed widow" pursuant to 45 U.S.C. § 231a(d)(4). Mary Kirkland testified in the Sandler proceedings that she had asked James whether he had been previously married, and he answered that he had not, although he admitted having had an illegitimate child with another woman. Mary further explained that she thought she was guaranteeing James's child support obligations when she signed the suretyship agreements in 1943. On the basis of his findings of Mary's good faith, the hearing examiner recommended that her widow's annuity be reinstated in accordance with the *Rosenberg* formula. Ruth Watkins would continue to realize the benefits she previously received, but because Ruth was also collecting social security payments, she was ineligible for a full widow's annuity, and Mary would receive that portion of the full annuity which Ruth could not legally collect.

The hearing examiner's decision was filed in February 1982. One might imagine that Mary Kirkland was relieved to have obtained a favorable ruling after almost 5½ years of litigation, but her hopes were soon to be dashed. In May 1982 a divided Board, over

---

1. Section 216(h)(1)(B) provides in relevant part,

In any case where ... such applicant is not the wife, widow, husband, or widower of such individual, but it is established ... that such applicant in good faith went through a marriage ceremony with such individual resulting in a purported marriage between them which, but for a legal impediment not known to the applicant at the time of such ceremony, would have been a valid marriage, and such applicant and the insured individual were living in the same household at the time of death of such insured individual, ... such purported marriage shall be deemed a valid marriage.

a dissent by member Chamberlain, rejected Sandler's recommendations and credibility findings, and indeed, virtually ignored his entire report. Instead, the majority relied on certain findings made by the appeals referee, and concluded, that in view of Mary's participation in the suretyship agreements, and her knowledge of Ruth's attack on James in 1943, it was inconceivable that she was ignorant of the previous marriage. Mary Kirkland petitions for review of this order.

### III

█ It is beyond question that a reviewing court may not substitute its judgment for that of an agency, or overturn an administrative determination supported by substantial evidence. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *State of Connecticut v. EPA,* 696 F.2d 147, 155 (2d Cir.1982). This standard applies no less forcefully to decisions of the Railroad Retirement Board than to those of other agencies. *Williams v. Railroad Retirement Bd.,* 585 F.2d 341 (8th Cir.1978) (per curiam); *Bertamini v. Railroad Retirement Bd.,* 440 F.2d 278 (D.C.Cir.1971). Courts need not, however, blindly adhere to administrative findings which are clearly unsupportable or are based upon an erroneous interpretation of the law.

█ In the present dispute the appeals referee's report, upon which the Board heavily relied, did not rest on a factual determination that petitioner lacked good faith at the time she married James Kirkland. Rather the referee denied Mary Kirkland reinstatement of her annuity as a result of his error in determining that *Rosenberg* did not apply. His conclusion was therefore premised on an unsound interpretation of law, and the Board could not properly rely on his decision. *See Treadwell v. Schweiker,* 698 F.2d 137, 144 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

█ Moreover, both the referee and the Board erred in placing great weight on Mary's participation in the suretyship agreements and her knowledge of Ruth's attack on James. These events occurred in 1943, two years after Mary's marriage, and have little if any bearing on her knowledge of James's marital status in 1941.[2] Indeed, the Board now concedes the important consideration is petitioner's knowledge at the time of her marriage, *see* 42 U.S.C. § 416(h)(1)(B); 45 U.S.C. § 231a(d)(4); 20 C.F.R. § 404.346(a) (1982), and its reliance on the events of 1943 to prove Mary's state of mind in 1941 was ill-founded.

In addition to its improper reliance on the referee's erroneous legal findings, and upon events occurring after 1941, the Board apparently ignored evidence in the record which demonstrated Mary had already been classified a "deemed spouse" by the Bureau of Retirement Claims. In a letter dated September 27, 1976, Mr. H.P. Gibbons, the Director of Retirement Claims, informed Mary Kirkland that her benefits were being terminated. He noted she had received the annuity until then, because "you were 'deemed' to be the widow ... when you filed for the widow's insurance annuity...." The Bureau's initial determination that Mary was deemed to be James's widow, necessarily entailed a finding that she entered into her marriage in good faith, without knowledge that James had previously been married, 42 U.S.C. § 416(h)(1)(B); 45 U.S.C. § 231a(d)(4), yet the Board provided no explanation for its sudden change of position and its new conclusion that Mary did know of James's marriage to Ruth.

█ The Board not only overlooked this previous finding of good faith, but also disregarded the hearing examiner's credibility findings and recommendation. This inattention to the credibility findings is particularly problematic, because the examiner,

---

**2.** We do not imply that events occurring after an event may never be probative of an individual's prior state of mind, but in this case, there is a complete dearth of evidence which would establish any connection between the actions occurring in 1943 and Mary's knowledge in 1941 of James's marriage to Ruth Watkins.

who heard petitioner's testimony, was best situated to assess the veracity of her claims. *See NLRB v. Stark*, 525 F.2d 422, 425–26 (2d Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976); *NLRB v. Herman Brothers Pet Supply, Inc.*, 325 F.2d 68, 71 (6th Cir.1963). The Board need not, of course, adopt the examiner's recommendations, but in evaluating the evidentiary basis for an agency's decision, a reviewing court may properly consider whether the fact-finder's determinations were followed, and if not, the reasons for ignoring them. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496–97, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951). In this case the Board provided no explanation for its failure to adhere to examiner Sandler's findings and credibility assessments, and the Board's substituted findings appear to be based upon little more than conjecture and surmise.

Stripped of all surplusage, the only remaining basis for the Board's conclusion was the fact of James's attendance at a court proceeding concerning his support obligations on June 6, 1941. Petitioner, however, testified that she had no knowledge of this event, and the Board has not provided any evidence to the contrary. Indeed, counsel conceded at oral argument that there was no direct or circumstantial proof demonstrating Mary was aware of the hearing or the nature of the proceedings. In sum, there is no evidence supporting the Board's finding, and certainly not that quantum of proof which a reasonable person would accept. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). We conclude the Board's findings were not supported by substantial evidence, and we therefore may not accept them.

IV

■ As we have noted, the Board has continually resisted application of the rule enunciated in *Rosenberg v. Richardson, su-*

*pra.* It is, of course, distinctly the province of the judiciary to interpret the law, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and we strongly caution the Board against ignoring rules of law established by this Court and other Courts of Appeals which have not been overruled by the Supreme Court. Respondent may urge reconsideration of decisions to which it objects, but it has no discretion to substitute its view of the law for those principles which we have already formulated. *Ithaca College v. NLRB*, 623 F.2d 224 (2d Cir.), *cert. denied*, 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980).

The Board notes that several other Circuits have declined to follow our decision in *Rosenberg*,[3] and urges us to reconsider that holding. We decline this invitation to overrule established precedent, and adhere to the views expressed in that opinion. Our decision in *Rosenberg* relied not only on the legislative history of 42 U.S.C. § 416(h)(1)(B), which as we have noted is expressly incorporated into the Railroad Retirement Act, 45 U.S.C. § 231a(d)(4), but also upon the principle that the Act is to be broadly construed to effectuate its beneficial purposes. *See Cunningham v. Harris*, 658 F.2d 239, 243 (4th Cir.1981) (citing *Rosenberg*); *Haberman v. Finch*, 418 F.2d 664, 666 (2d Cir.1969). Respondent has advanced no persuasive basis for rejecting the *Rosenberg* holding, and we reaffirm our decision in that case.

■ A final issue raised for our consideration may be disposed of briefly. Mary Kirkland requests an award of attorney's fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412. The language of the statute appears to vest discretionary authority in a court to grant a fee request, *see* 5 U.S.C. § 504(c)(2); 28 U.S.C. § 2412(a), but prohibits an award where "the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A); *see* 5 U.S.C. § 504(a)(1),

**3.** *See Martin v. Harris*, 653 F.2d 428 (10th Cir. 1981) (*but see* Judge McKay's dissent at 433–36), *cert. denied*, 454 U.S. 1165, 102 S.Ct. 1039, 71 L.Ed.2d 321 (1982); *Dwyer v. Califano*, 636 F.2d 908 (3d Cir.1980); *Davis v. Califano*, 603 F.2d 618 (7th Cir.1979); *but see Woodson v. Schweiker*, 656 F.2d 1169 (5th Cir.1981).

(2). *See Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board,* 679 F.2d 64 (5th Cir.1982). On the facts of this case, we believe the Board has sustained its burden of showing that its position, although erroneous, was not so devoid of legal or factual support that a fee award is appropriate.

### V

The Railroad Retirement Board's order is vacated and the case is remanded. Within 30 days of the date of this decision, the Board will determine the amount of benefits for which Mary Kirkland is eligible, including all past sums which were improperly denied, and will commence payment.